# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-417 (PLF)** |
| **v.** | : | |
| | : | |
| **DANIEL WARMUS,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Daniel Warmus to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Daniel Warmus, a 38-year-old auto-mechanic from Alden, New York, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

Defendant Warmus pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 30 days' incarceration, followed by probation and community

---

[1] Although the Statement of Offense in this matter, filed on May 23, 2022, (ECF No. 34 at ¶6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

service, is appropriate in this case because (1) Warmus was in the first wave of rioters to breach the Capitol Building on its west side, and was among the first rioters to reach the Capitol Rotunda, (2) during his approximately 15 minutes inside the Capitol building, Warmus extensively recorded events, including the first breach of the East Rotunda Doors, (3) after witnessing and recording the first breach of the East Rotunda Doors, Warmus made a waving gestured towards the Doors as if encouraging other rioters to assist rioters in the breach, (4) Warmus evaded a Capitol Police officer's attempt to detain him, and Warmus remained in the Capitol building following this interaction with police, (5) despite his extensive cell phone recording, Warmus appears to have deleted all January 6 content from his cell phone, and (6) while on pretrial release, Warmus has publicly posted videos of himself harassing police officers to the point of trying to break into police cruisers—and, more generally, Warmus has yet to show any meaningful contrition for his conduct on January 6, 2021.

The Court must also consider that Warmus's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00133 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates).  The defendant's actions, viewed in conjunction with those of his fellow rioters, enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the

numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, the facts of and circumstances of Warmus's crime support a sentence in this case of 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

## II.    Factual and Procedural Background

### The January 6, 2021, Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 34 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Warmus's conduct and behavior on January 6.

### Defendant Warmus's Role in the January 6, 2021, Attack on the Capitol

Daniel Warmus drove from his home in Alden, New York, to Washington, D.C., to participate in the "Stop the Steal" rally in support of former President Donald Trump.  On January 6, 2021, Warmus approached the United States Capitol from the west.  At the time of Warmus's approach, rioters had recently breached a police line at the edge of Capitol grounds near an area called Peace Circle.  Rioters then breached two more police lines before surrounding Capitol Police at the Lower West Terrace and near the base of the Northwest Scaffolding and Stairs.  While on Capitol grounds, Warmus was wearing a black "hoodie" sweatshirt that said, "CNN is fake news," and he carried a black flag that, in large, white block lettering, read "FUCK ANTIFA."



*Exhibit 1 – Screen capture of video showing Warmus standing near Washington Monument on January 6, 2021, holding a large flag reading, "FUCK ANTIFA," attached to a tree branch.*

Open-source video captured Warmus on the West Lawn, likely around 1:30 p.m.,[2] facing off with a line of Capitol Police officers clad in riot gear as other rioters yelled, "Oath breakers!" One rioter, standing near Warmus, yelled, "The Nazis were just following orders just like you guys!"  The same video shows rioters climbing and standing on the wall of the Northwest stairs, leading to the Upper West Terrace.

---

[2]     The video captures rioters on the West Lawn which must have been after the breach at Peace Circle, which occurred at approximately 12:53 p.m., but before the breach of the Northwest Stairs, which occurred at approximately 1:50 p.m.



*Exhibit 2 – Screen capture of open-source video.  Warmus is on the right side of the frame, highlighted by a red box.  The rioter who compared Capitol Police to Nazis is on the left side of the frame wearing a red jersey.*

At around 1:50 p.m., rioters attacked police guarding a narrow entry to the Northwest Stairs, eventually breaching that line, and another line at the top of the stairs.  These breaches allowed the first wave of rioters to reach the Senate Wing Door from the Upper West Terrace, which was the site of the first interior breach of the Capitol Building at approximately 2:12 p.m.

Warmus entered the United States Capitol Building through the Senate Wing Door at approximately 2:17 p.m., within five minutes of the initial breach.  Warmus's entry and path through the Capitol are visible on Capitol closed-circuit television (CCTV).  When he entered the building, Warmus was no longer carrying the large "FUCK ANTIFA" flag.



*Exhibit 3A – Screenshot of Capitol CCTV showing Warmus's entry into the Capitol building at 2:17 p.m.  Warmus is highlighted by the red box.*

Once inside the building, Warmus first went to the left, in the direction of the Senate Chamber. Like other rioters who tried to go in the same direction, Warmus was turned around.  Warmus then crossed the Senate Wing Door lobby in the opposite direction, towards the Capitol Crypt.  As he entered and walked through the Capitol building, Warmus appeared to be recording events using a cellular telephone.



*Exhibit 3B – Screenshot of Capitol CCTV showing Warmus holding up what looks like a cellular telephone (indicated by red arrow) as if recording.*

Warmus was among the first rioters to reach the Capitol Rotunda, at approximately 2:24 p.m. (*see below*, Exhibit 4A), still recording (*see below*, Exhibit 4B).



*Exhibit 4A – Warmus is among first rioters to reach the Rotunda at approximately 2:24 p.m.*



*Exhibit 4B – Warmus still recording after having entered the Rotunda.*

He stepped over the velvet ropes, and walked toward the East Rotunda Doors ("Doors"), where he witnessed and recorded the first breach of those Doors at approximately 2:25 p.m.   Two

approximately simultaneous CCTV screenshots (*see* Exhibits 5 and 6, below) of cameras showing the East Rotunda Door interior show where Warmus was and what he was seeing.  In the first screenshot (Exhibit 5), Warmus is standing toward the right of the frame (circled in red) as a Capitol official wearing a suit (circled in blue) runs toward the East Rotunda Doors to try to prevent rioters outside from breaching the Door.  The second screenshot (Exhibit 6) is from CCTV showing the same area but from the opposite direction.  It depicts the same official running towards the Doors (again, circled in blue).



*Exhibit 5 – Warmus recording the breach of the East Rotunda Doors while a Capitol official runs to stop rioters from entering the Building.*



*Exhibit 6 – A Capitol official running to stop rioters from entering the Building through the East Rotunda Doors, which have already been broken by rioters outside, as two rioters try to facilitate the breach from the inside.*

This screenshot also shows the glass in the Doors broken by rioters on the outside and two rioters trying to facilitate the breach from the inside. At this time, Capitol Police officers were standing outside and in front of the Doors. Rioters outside screamed at, pushed, pulled, and otherwise assaulted these law enforcement officers guarding the Doors, ultimately breaching that entryway, about a minute later. Warmus watched and recorded these events for about 40 seconds while other rioters also rushed past him, towards the Doors to assist in the breach, then turned and walked back into the Rotunda.

As Warmus reentered the Rotunda, he shook one of his hands and gestured toward the Doors, as if saying "Let's go!" or encouraging other rioters in the Rotunda to go to the Doors. Warmus continued to watch the Doors from the Rotunda until a Capitol Police officer clad in riot gear ran into the Rotunda and began trying to grab rioters, as if trying to remove them from the Rotunda. The officer tried to grab Warmus, but Warmus shuffled backwards beyond the officer's reach. After this interaction, Warmus resumed walking around the Rotunda, appearing to record.

At one point, he picked up an unknown black object that looks like a hat and put it on one of the statues in the Rotunda.

Warmus exited the Rotunda around 2:28 p.m. and headed back to the Senate Wing Door, where he exited the building at around 2:33 p.m.  In total, Warmus spent 16 minutes inside the Capitol Building.

Some time after January 6, 2021, but no later than January 12, 2021, Warmus boasted about having entered the Capitol on January 6 to others in a dentist's office.  He showed one of those people a video he had taken while inside the Capitol on his phone.

Despite CCTV footage indicating that Warmus recorded extensively while inside the Capitol Building, a search of Warmus's phone pursuant to a search warrant obtained near the time of Warmus's arrest on May 18, 2021, revealed next to no content – photos or videos – from inside the Capitol Building on January 6, 2021.[3]  Within days of the riot, Warmus sent text messages to others indicating that he had either replaced his SIM card or gotten a new phone number.  The government has not obtained direct evidence that Warmus replaced the SIM card deliberately to hide evidence of his conduct on January 6, but the fact remains that Warmus recorded on his cell phone nearly the entire time that he was inside the Capitol, and that he showed video to at least one person after January 6, yet those photos or videos appear to no longer exist.

To date, Warmus has not been interviewed by the FBI or provided any substantive statement regarding his offense conduct to probation.  When he was arrested, Warmus made

---

[3]     The search revealed one photograph of Warmus, apparently taken by another person, standing outside the Capitol Building on January 6, 2021.  There were also a handful of "thumbnail" photos and videos which appear to be copies of content created on January 6 either by Warmus or others.  These thumbnails do not appear to be the original content created by Warmus while he was inside the Capitol on January 6.

statements to the effect of, "I should have been filming the guys who were fighting the cops" and "the worst thing that I did was pick up a hat."

*The Charges and Plea Agreement*

On May 17, 2021, the United States charged Warmus by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On May 18, 2021, law enforcement officers arrested him at his home in Alden, New York. On June 21, 2021, the Warmus was charged by four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G).  On May 23, 2022, pursuant to a plea agreement, Warmus pleaded guilty to Count 4 of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Warmus agreed to pay $500 in restitution to the Architect of the Capitol.

## III.   Statutory Penalties

Warmus now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.  The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, §

3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Warmus's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the

12

defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Warmus personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Warmus is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.  The defendant's lack of violence and property destruction is the only reason he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Warmus entered the Capitol Building at its first breach point, the Senate Wing Door, within five minutes of the initial breach.  And though he was five minutes behind the first rioters to enter the building, he was among the first rioters to reach the second floor of the Capitol and the Capitol Rotunda, putting him in a position to witness some of the most notable riotous behavior and breaches.  Warmus's 15 minutes inside the building covered 15 of the first 20 minutes after the Capitol was first breached, as the pressure of the riot escalated inside the building and police were stretched to their absolute thinnest.  He participated in and saw some of the first major breaches of the building and directly interacted with and defied a police officer.

For nearly the entire time that Warmus was inside the Capitol, Warmus recorded videos, photos, or both using a cellular telephone.  He stood back, watched, and recorded while rioters assaulted Capitol Police outside the East Rotunda Doors, while rioters on the inside tried to open those doors, and while a Capitol official tried to stop them.  He showed one of these videos to a stranger in a dentist's office after January 6, boasting about having been inside the Capitol.  Yet, when law enforcement recovered Warmus's cell phone and searched it, they found no photos or videos from January 6 on the device.  Even if Warmus did not deliberately replace his phone or

his SIM card to destroy evidence of his participation in the Capitol Riot, at the very least, he failed to preserve evidence, including of a key breach of the building at the East Rotunda Doors, that could have aided law enforcement.  Ironically, when he was arrested, Warmus said something to the effect of, "I should have been filming the guys who were fighting the cops."

Warmus knew that rioters were committing violence against police officers.  He saw it. And, from what is visible on CCTV, it looks like he did film it.  Warmus knew he wasn't supposed to be inside the Capitol.  When a Capitol Police officer tried to remove him from the Rotunda, he jumped away, and continued meandering about the Rotunda recording on his cell phone. Warmus's overly casual demeanor amidst the extreme circumstances demonstrates an indifference to violence and property destruction that is aggravating.   The nature and circumstances of Warmus's offense are serious and establish the need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Warmus has minimal criminal history including offenses that are nearly 20 years old.  (PSR ¶¶30, 31.)  Warmus is 38 years old and is employed as an auto mechanic who owns his own automotive repair business.

Warmus has been technically compliant with his conditions of pre-trial release.  However, Warmus maintains a YouTube channel called "Auditing Erie County (AEC)".  (*See* PSR ¶¶ 7-9.) Warmus records and posts videos to his channel showing him antagonizing police officers, attempting to goad them into negative interactions with him.  In two separate instances while on pretrial release (August 24, 2021, and April 15, 2022) as discussed in the PSR, Warmus reportedly tried to open and enter police cruisers.  (PSR ¶¶ 7, 9.)  In the April 2022 incident, Warmus was detained for this conduct, but was released without charges after refusing to provide his name. Warmus continues to post these videos to YouTube while on pretrial release.

Warmus also reportedly had a large amount of ammunition and bow arrows in his apartment as of June 16, 2021, which he was instructed to remove after his apartment was inspected by pretrial services.  As a condition of probation, if imposed, the government respectfully requests that Warmus be prohibited from accessing firearms and ammunition.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[4]    Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred." *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37) (statement of Judge Nichols at sentencing).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Warmus has yet to make any statement apologizing for or expressing regret for his conduct on January 6, 2021.  Furthermore, his conduct while on pretrial release mirrors his conduct inside the Capitol on January 6—filming police officers under stressful conditions, many of Warmus's own making.  This behavior, including his two separate attempts to open and enter police cruisers, strongly suggests that Warmus will continue to engage in conduct that obstructs, impedes, and/or directly harms law enforcement.  A sentence of incarceration is thus warranted to specifically deter Warmus from engaging in this conduct in the future, as well as to protect the community.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5]  This Court must sentence Warmus based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Warmus convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[6]  *See United States v. Anna*

---

[5]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track"

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing); *accord United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Warmus has pleaded guilty to Count 4 of the Information, charging him with parading, picketing, or demonstrating in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A

---

program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The government has often recommended, and judges have imposed, periods of incarceration in cases where a defendant's conduct has included one or more of the various aggravating factors present here. For instance, judges have imposed incarceration in cases where the defendant blatantly disregarded police orders. *See, e.g., United States v. Joshua Wagner*, 1:21-CR-00310 (imposing 30 days' jail time where defendant, among other things, ignored police orders in the Crypt); *United States v. Bradley Rukstales*, 1:21-CR-00041 (imposing 30 days' jail time where, among other things, it took three officers to drag the defendant to be arrested) ; *United States v.* Terry Brown, 1:21-CR-00041 (imposing 30 days'

home detention and 36 months' probation where, among other things, defendant was arrested after refusing to leave pursuant to law enforcement orders).

Judges have imposed incarceration in cases where the defendant witnessed and/or recorded breaches or violence against police officer. *See, e.g., United States v. Anthony Vuksanaj*, 1:21-CR-00620 (imposing 42 days' intermittent confinement and 36 months' probation where, among other things, defendant was present during two physical clashes with police, and yet did not exit the building but instead continued to trespass through the Capitol); *United States v. David Mish*, 1:21-CR-00112 (imposing 30 days' jail time where, among other things, defendant, who was in the Capitol for about 30 minutes, took photos, heard the shot that killed Ashli Babbitt, and witnessed violence against law enforcement).

Judges have imposed incarceration in cases where the defendant's words and/or actions demonstrated a lack of remorse. *See, e.g., United States v. Jeremiah Caplinger*, 1:21-CR-00342 (imposing 35 days' jail time and 24 months' probation where, among other things, defendant engaged in a multitude of behaviors that demonstrated a lack of remorse: posting statements on social media on and after Jan. 6th that demonstrated a lack of remorse, participating in a photoshoot and giving interviews that demonstrated a lack of remorse to two separate publications, omitting information and repeatedly downplaying his actions on January 6th during an FBI interview, and shirking the terms of his pretrial release by repeatedly used marijuana); *United States v. Philip Weisbecker*, 1:21-CR-00682 (imposing 30 days' intermittent confinement and 24 months' probation where, among other things, defendant wandered through restricted hallways and into the Rotunda where he took photographs of himself, posted statements on social media which demonstrated a total lack of remorse, verbally abused law enforcement officials who stopped and questioned him about January 6 and engaged in post-guilty plea verbally abusive conduct towards

transportation officials he believed harassed him, demonstrated defendant's contempt for public officials).

Judges have imposed incarceration in cases where the defendant engaged in destruction of evidence. *See, e.g., United States v. Paul Westover*, 1:21-CR-00697 (imposing 45 days' incarceration where, among other things, defendant destroyed evidence by deleting photos and videos recorded on January 6 from his Facebook account and cell phone); *United States v. Jeremy Sorvisto*, 1:21-CR-00320 (imposing 30 days' jail time where, among other things, defendant was among the first in the Capitol and stayed for about 25 minutes, and after the fact destroyed evidence and expressed no remorse).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation

omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Blakely*, 21-cr-00356 (EGS), ECF 38 (D.D.C. July 14, 2022); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022).[7] In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

1.     **A sentence imposed for a petty offense may include both incarceration and probation.**

---

[7] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

*Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[8] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[9] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

---

[8] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

[9] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

*Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by

probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.*

("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law:*

*The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress

27

enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense

case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Lunyk pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

2.    **A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

*Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[10]

*Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[10] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[11]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

---

[11] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Daniel Warmus to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:      /s/
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
601 D St. NW
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048